## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **LARRY MAURICE BANKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 10 C 1486** |
| | ) | |
| **DR. MATTHEW MILLS and** | ) | |
| **DR. BASHEER AHMED,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Larry Banks has sued Dr. Matthew Mills and Dr. Basheer Ahmed[1] under 42

U.S.C. § 1983. He contends that Dr. Ahmed violated his constitutional rights by forcibly

medicating him with quetiapine, an anti-psychotic drug that is often sold under the brand

name Seroquel. Banks further asserts that Dr. Mills denied him constitutionally

adequate medical care by, among other things, failing to provide this prescribed drug to

him at the Cook County Jail.

Dr. Ahmed and Dr. Mills have moved for summary judgment, arguing that Banks

cannot establish that they acted with deliberate indifference and alternatively that they

are immune from suit. Banks has also moved for summary judgment on the question of

liability. For the reasons stated below, the Court grants Dr. Ahmed's motion for

summary judgment, grants Dr. Mills's motion for summary judgment in part and denies it

in part, and denies Banks's motion for summary judgment.

---

[1] Dr. Ahmed recently passed away, and the process of substituting an estate administrator for him as a party has begun.

**Procedural Issues**

Northern District of Illinois Rule 56.1 is designed to "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trs*., 233 F.3d 524, 527 (7th Cir. 2000). In their briefs and related Rule 56.1 submissions, all three parties contend that the opposing side has failed to abide by the requirements of the rule and ask the Court to strike a number of statements of fact or disputed facts.

The parties' dispute over the Local Rule 56.1 submissions and their requests to strike various statements of fact have become a collateral matter that distracts from the central questions concerning the defendants' liability for constitutionally infirm medical care. "The Rule is designed, in part, to aid the district court . . . in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). Because the parties' Local Rule 56.1 submissions have only further complicated matters, the Court has reviewed the record in its entirety, drawing directly from the admissible evidence instead of the parties' statements of fact. The Court therefore denies as moot the parties' requests to strike their opponents' submissions. *See Smith v. Hardy*, No. 10 C 6436, 2012 WL 2127488, at *1 (N.D. Ill. June 12, 2012).

Banks has also objected to three affidavits that Dr. Mills included as exhibits to his motion for summary judgment. Banks argues that the three affiants were not identified in Dr. Mills's initial disclosures, in violation of Federal Rule of Civil Procedure 26(a)(1). Banks has not addressed the application of the standards under Federal Rule

of Civil Procedure 37 for exclusion of unproduced evidence.  Thus the Court will not

consider his objection to the inclusion of the affidavits at this stage of the case.

Finally, Dr. Mills asks the Court to strike a July 11, 2008 letter from the U.S.

Department of Justice (DOJ) to Cook County Board President Todd Stroger and Cook

County Sheriff Thomas Dart that Banks included as an exhibit to his motion for

summary judgment, on the ground that it is inadmissible as evidence.  Because the

Court has not relied on the DOJ letter in determining the parties' motions for summary

judgment, the Court need not rule on the admissibility of the letter at this time.

**Background**

**I.    Banks's treatment at Chester MHC**

On August 2, 2007, Banks was admitted to Elgin Mental Health Center (Elgin

MHC) after he was found unfit to stand trial on a number of criminal charges.  On June

6, 2008, Banks was transferred to Chester Mental Health Center (Chester MHC).

Chester MHC records indicate that Elgin MHC transferred him because of his

"aggression and threatening behavior towards staff and peers at Elgin MHC."  Ahmed

Ex. F at 1.  During his initial psychiatric examination, Banks refused to take any

medication except Benadryl, an antihistamine.  Shortly after the initial examination,

Banks was assigned to Dr. Ahmed's care.  Dr. Ahmed eventually diagnosed Banks as

having a severe mood disorder.

Banks's medical records reflect that on June 7, 2008, he was physically

restrained to a bed and given emergency medical injections after he made an

unprovoked attack on Chester MHC staff.  He was released from the restraints later that

evening.  Banks testified that Dr. Ahmed met with him shortly afterward and told him

that he suffered from mood instabilities and needed medication.  When Banks refused, Dr. Ahmed told him that he could not find Banks fit to stand trial until he was on some form of medication.  Banks continued to refuse.  Dr. Ahmed asked staff to place Banks under frequent observation for aggressive behavior toward others.

On June 10, Banks was involved in a fight with another patient at Chester MHC and refused to stop fighting when staff intervened.  Banks was again physically restrained and various medical log entries in the hours following his restraint remark that Banks was "grandiose," "uncooperative," "threatening[,] and unpredictable."  Ahmed Ex. G at 68.  He was released from the restraints the next day around noon.

On June 13, 2008, Dr. Ahmed issued an emergency enforced medication order, directing staff to immediately begin giving Banks 300 milligram dosages of quetiapine, an antipsychotic medication, to "prevent aggressive episodes."  *Id.* at 69.  In his handwritten record entry documenting the order, Dr. Ahmed noted that he planned to seek court-authorized involuntary medication for Banks.  On June 17, Dr. Ahmed prepared a psychiatric evaluation in support of his request to the state Circuit Court to authorize involuntary treatment.  In his evaluation, Dr. Ahmed noted that Elgin MHC records indicated that Banks had been verbally aggressive with staff a number of times in late 2007.  According to Dr. Ahmed, Banks's behavior had continued to escalate, and in April 2008, he began to threaten physical harm and had to be restrained.  On June 2, shortly before he was transferred to Chester MHC, Banks's medical records reflected that he "attempted to choke [a] peer by lifting the peer in the air with his neck."  Ahmed Ex. H at 6.  Dr. Ahmed also discussed his diagnostic impressions of Banks:

> Mr. Banks clearly displays signs of mood instability which includes mood
> swings, labile affect with some animosity, pressured speech, with

circumstantial details.  He is very oppositional, argumentative, and defiant.
He exhibits paranoid and grandiose misperceptions.

*Id.* at 8.  Dr. Ahmed concluded that Banks's symptoms were consistent with a diagnosis

of "Mood Disorder with Psychosis" but that bipolar disorder could not be ruled out.  *Id.*

Because Banks refused to consider voluntarily taking psychotropic medications

(including any antipsychotics), Dr. Ahmed opined that Banks should be forcibly

medicated.

Dr. Ahmed's petition was filed with the Randolph County Circuit Court.  On June

25, after a brief hearing, the court granted Dr. Ahmed's petition and authorized him to

administer fourteen different psychotropic medications, including up to 1200 mg daily of

quetiapine daily, for ninety days.  Mills Ex. F.  The trial court's order was eventually

reversed on appeal in September 2009 by the Illinois Appellate Court.  *See generally In*

*re Larry B.*, 394 Ill. App. 3d 470, 914 N.E.2d 1243 (2009).  The appellate court

concluded that the Dr. Ahmed's conclusory testimony was insufficient to establish by

clear and convincing evidence that forcibly medicating Banks was appropriate.  *Id.* at

476, 914 N.E.2d at 1248 ("The evidence at the hearing was factually insufficient to allow

the court to find that the benefits of the administration of psychotropic medication to the

respondent outweighed the risks.").

Banks testified during his deposition that he complied with the court's order to

take Seroquel for ninety days.  According to Banks, he experienced dry mouth and a

tight, bulging stomach as a result of taking the medication.  Banks's medical records

indicate that he reported feeling overmedicated on June 13 and that on June 24, he

complained of nausea and dryness in his throat as a result of his medication.  Banks

testified that he stopped taking Seroquel three days before he was discharged from

Chester MHC.  At the time he was discharged, Banks was prescribed 500 mg daily of Seroquel, and 2 mg of Lorazepam (for anxiety) as needed.

II.  **Banks's treatment at Cook County Jail**

On October 16, 2008, Banks was transferred from Chester MHC to the Cook County Jail (CCJ) and was assigned to Tier 2-North of the Cermak Health Services facility.  On October 20, Banks met with Dr. Mills, who diagnosed Banks as schizophrenic.  Dr. Mills told Banks that he would continue the prescription for Seroquel that Banks had been receiving at Chester MHC, and he discharged Banks from Cermak Health Services to Division X of CCJ.

The parties hotly dispute the events that followed Banks's discharge from Cermak.  Banks testified that he was not offered Seroquel from mid-October 2008 until mid-August 2009.  Instead, the nurses responsible for distributing the medication consistently told him that they did not have a Seroquel prescription for him.  He stated that he told Dr. Mills that he was not receiving his medication and that Dr. Mills responded either that "he would . . . check into it" or that "there was nothing else he [could] do outside of prescribing [Banks] the medication."  Mills Ex. B at 75 & 107.  According to Banks, he finally began receiving Seroquel in August 2009.

Banks states that he began experiencing withdrawal from Seroquel immediately upon arriving at CCJ.  Specifically, he has testified that he had trouble sleeping and began having racing thoughts, dry mouth, and hot and cold flashes.  He also began to lose weight and "couldn't . . . hold [any]thing in [his] stomach."  *Id.* at 36.  At some point, he says, he began feeling suicidal.

Dr. Mills agrees that he saw Banks on October 20 and that he determined to continue Banks's Seroquel prescription. Dr. Mills's handwritten notes reflect, however, that Banks had been refusing Seroquel since his admission to Cermak Health Services. Dr. Mills testified that based on his review of the medical records, Banks was offered and rejected Seroquel for a vast majority of the days from mid-October through December of 2008. Dr. Mills stated that on January 26, 2009, he decided to discontinue Banks's prescription for Seroquel, based on his conclusion that despite not taking Seroquel for an extended period of time, Banks was able to maintain stability. Dr. Mills further explained that given Banks's "long pattern of him refusing [medication] . . . and now with repeated instances of behavioral problems, it now became rather clear that it's not a good use of our limited resources to continue to offer a man a medication that he has steadfast[]ly made clear he is not going to take." Mills Ex. D at 88.

According to Dr. Mills, he met with Banks on April 28, 2009 after Banks filed a grievance stating that he was "losing it." *Id.* at CCSA 376. Dr. Mills testified that Banks stated that he needed to go back on Clonazepam (sold under the brand name Klonopin), an anticonvulsant and sedative, but that he told Banks that his prescription was for Seroquel, not Clonazepam, and he offered to write Banks a prescription for Seroquel. Banks replied that he needed to speak with his attorney before agreeing to take the medication. Dr. Mills stated that he began prescribing Seroquel for Banks on August 20, 2009 after Banks agreed to take the prescription.

Dr. Mills has submitted a number of medical records from CCJ regarding Banks's medical treatment from 2007 (when he was first detained) through 2011, including a number of medication administration records (MARs). A number of CCJ medical staff

testified that the nurses at the jail use the MARs to record their daily distribution of

medication to each detainee.  The MAR form, which covers a calendar month, specifies

a detainee's current prescriptions for that month and provides space for the nurse

administering the medication on a particular day to remark on whether the detainee

actually took it.  Specifically, the MAR form instructs a nurse to:  (1) initial the daily box if

the detainee's medication is successfully administered, (2) write "R" if the medication is

refused, (3) write "C" if the detainee is at court, (4) initial and circle the box if there is no

medication available, (5) write "H" if there is a "hold," (6) write "D/C" if the medication

was discontinued, and (7) write "N/P" if the detainee was not present.  There is no

provision indicating that a nurse should leave the box blank for any reason.

A number of nurses have testified regarding their understanding of the MARs and

when the various notations are to be used.  Many of the nurses disagreed regarding

what a particular entry would indicate about the interaction between the detainee and

the nurse administering the medication.  For example, Dorothy Burwell, a former CCJ

nurse, testified that if a box was left blank, it meant that the detainee did not receive his

medication but not necessarily for any specified reason.  Nurse Janet Watts, however,

testified that when a box was blank, she was "sure they gave the med."  Mills Ex. J at

78.

Additionally, the MAR instructs that when a patient refuses his medication and

the nurse marks "R" in the daily box, the nurse should obtain a refusal form from the

patient.  Many of the nurses testified that CCJ's policy is to ask patients to sign a refusal

form for each day that the detainee refuses his medication, regardless of how

consistently he refuses.  At least one nurse testified, however, that he occasionally

forgets to give patients refusal forms when they refuse medication and instead will simply mark the box in the MAR with an "R."

Banks's MARs for the months of October through December 2008—when Dr. Mills contends that he was prescribing Seroquel for Banks—contain a number of "R" entries, indicating a report by the nurse that he had refused the medication on those dates. Yet the MARs also reflect a number of days for which the entry is left blank altogether, as well as a number of days marked "NP" (for "not present"). By contrast, the pharmacy records for Banks indicate that the Cermak pharmacy approved Seroquel for Banks consistently from October 17, 2008 until January 26, 2009.

Finally, Banks's medical records contain six consent refusal forms. Of those, only the first refusal, dated October 20, 2008, is signed; the others state that the patient refused to sign. Banks admitted refusing a 200 mg dose of Seroquel on October 20, when he was still at Cermak Health Services. He stated that he did so because the prescribing doctor "tried to take [him] off of the original dosage that [he] was getting from Chester." Mills Ex. B at 59. Banks explained that he feared he would again be found unfit to stand trial if he agreed to the lower dosage.

### Discussion

Summary judgment is proper when "the admissible evidence, construed in favor of the non-movant, reveals no genuine issue as to any material facts and establishes that the movant is entitled to judgment as a matter of law." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 690–91 (7th Cir. 2010). A genuine issue of material fact exists if there is sufficient evidence to allow a reasonable jury to find in favor of the non-movant. *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010). "It is

not for courts at summary judgment to weigh evidence or determine the credibility of such testimony." *Berry*, 618 F.3d at 691 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

## I.    Dr. Ahmed

Dr. Ahmed argues that he is entitled to absolute immunity for any testimony given in state court at the hearing on his petition to involuntarily medicate Banks and for any actions that he took in medicating Banks after the state trial court approved his petition. He further argues that he is entitled to summary judgment regarding his decision to forcibly medicate Banks from June 13, 2008 to June 25, 2008 (the date of the hearing) because Banks has failed to offer evidence that he acted with deliberate indifference to his needs, or alternatively that his actions are protected by qualified immunity.

### A.    Absolute immunity

Because Banks expressly disavows any claim against Dr. Ahmed for his testimony at the hearing in state court, the Court need not discuss Dr. Ahmed's entitlement to absolute immunity for a claim arising from that testimony. *See Briscoe v. LaHue*, 460 U.S. 325, 343 (1983). Thus the Court is left with the question of whether Dr. Ahmed is entitled to absolute immunity for his conduct following the hearing, when he forcibly medicated Banks after the June 25 court order.

A judge is entitled to absolute immunity from suit under section 1983 for his judicial conduct. *Snyder v. Nolen*, 380 F.3d 279, 285–86 (7th Cir. 2004) (citing *Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001)). Judicial immunity is important to protect "the independent and impartial exercise of judgment vital to the judiciary [that] might be impaired by exposure to potential damages liability." *Antoine v. Byers &*

*Anderson, Inc.*, 508 U.S. 429, 435 (1993). In addition, the Seventh Circuit has recognized "quasi-judicial" immunity for individuals who, although not judges, either perform adjudicatory functions or execute the facially valid orders of judges. *Coleman v. Dunlap*, 695 F.3d 650, 652 (7th Cir. 2012). Dr. Ahmed's conduct, if it is protected at all, falls within the latter category.

Under Illinois law, a state official may not forcibly medicate a patient—subject to narrow exceptions discussed below—unless he has been granted authority by a court to do so. In June 2008, Dr. Ahmed, on behalf of the State, petitioned the circuit court for authorization to involuntarily medicate Banks pursuant to 405 ILCS 5/2-107.1. This statute requires a court, in adjudicating a petition for involuntary medication, to determine whether the State has established by clear and convincing evidence:

> (A) That the recipient has a serious mental illness or developmental disability.
>
> (B) That because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior.
>
> (C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.
>
> (D) That the benefits of the treatment outweigh the harm.
>
> (E) That the recipient lacks the capacity to make a reasoned decision about the treatment.
>
> (F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe effective administration of the treatment.

402 ILCS 5/2-107.1(a-5)(4). If the court concludes that the State has met these criteria, the court's order must "specify the medications and anticipated range of dosages that have been authorized and may include a list of any alternative medications and range of dosages deemed necessary." *Id.* § 2-107.1(a-5)(6). Finally, the statute provides that any person authorized to administer the treatment ordered by the court "shall have complete discretion not to administer any treatment authorized under this Section." *Id.*

The June 25, 2008 order issued by the Randolph County Circuit Court judge authorized Dr. Ahmed to administer fourteen different medications, and it listed under "dosage range" a maximum daily dosage for each medication. Mills Ex. F. It is undisputed that Dr. Ahmed did not administer all of these medications—he prescribed only Seroquel—and that he did not ever administer the maximum amount of dosage per day. Banks argues that the type of discretion Dr. Ahmed exercised in treating Banks establishes that he was not acting pursuant to a facially valid court order sufficient to protect him from suit.

In *Richman*, the Seventh Circuit differentiated between conduct that was specifically ordered by the judge and conduct that instead related to the manner in which the order was enforced. *Richman*, 270 F.3d at 436 ("[F]idelity to the specific orders of the judge marks the boundary for labeling the act 'quasi-judicial.'"); *see also Martin v. Bd. of Cnty. Comm'rs of County of Pueblo*, 909 F.2d 402, 405 (10th Cir. 1990) ("We conclude that absolute immunity does not protect defendants from damage claims directed not to the conduct prescribed in the court order itself but to the manner of its

execution."). These cases reflect that when deciding whether to extend absolute liability to an individual's conduct, the relevant inquiry is not whether the individual had discretion to choose among various alternatives, but rather whether the chosen action was expressly contemplated by the judicial order in question.

The court's order entered after the hearing on Dr. Ahmed's petition expressly authorized Dr. Ahmed to forcibly medicate Banks, and it listed Seroquel among the acceptable medications. The court thus determined that it was lawful to medicate Banks with Seroquel after taking into consideration his rights under state law and the U.S. Constitution. Banks does not challenge the way in which the medication was delivered. Instead, Banks's claim against Dr. Ahmed is that Dr. Ahmed should not have forcibly medicated him at all. That claim is no different from a complaint against the court for improperly abridging Banks's constitutional rights. *Snyder v. Nolen*, 380 F.3d 279, 287 (7th Cir. 2004) ("The policy justifying an extension of absolute immunity . . . is to prevent court personnel and other officials from becoming a lightning rod for harassing litigation aimed at the court."). The fact that the court's order was permissive rather than mandatory in terms of medication type and dosage does not distinguish this case from cases in which absolute immunity has been applied. *See, e.g., Kincaid v. Vail*, 969 F.2d 594, 601 (7th Cir. 1992) (court clerks entitled to quasi-judicial immunity when they rejected a party's filing based on a judicial direction); *Valdez v. City & Cnty. of Denver*, 878 F.2d 1285, 1289 (10th Cir. 1989) (law enforcement officials carrying out contempt order were immune from suit for false arrest and imprisonment). Although he was given discretion not to act or to provide a lesser dosage, Dr. Ahmed's conduct in forcibly medicating Banks was expressly authorized by the court order.

As the Tenth Circuit noted in *Valdez*, "[t]he proper procedure for a party who wishes to contest the legality of a court order enforcing a judgment is to appeal that order and the underlying judgment, not to sue the official responsible for its execution." 878 F.2d at 1289–90. Banks did appeal, and he ultimately persuaded the appellate court to reverse the trial court's decision. Though it is regrettable that the appeal was not decided until after the ninety days had passed, this does not permit Banks to sue Dr. Ahmed, who was fully authorized to enforce the circuit court's order while it remained in effect. The Court concludes that Dr. Ahmed is entitled to quasi-judicial immunity for forcibly medicating Banks pursuant to the June 25, 2008 court order.

### B.   Dr. Ahmed's emergency medication order

Dr. Ahmed began forcibly medicating Banks with quetiapine on June 13, twelve days before the court order authorizing involuntary treatment. Thus Dr. Ahmed's entitlement to quasi-judicial immunity does not cover his actions from June 13 to June 25. Banks's claim against Dr. Ahmed concerning this period may proceed if he has offered evidence that would allow a reasonable jury to conclude that Dr. Ahmed was aware that Banks had a substantial medical need and acted with deliberate indifference to that need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Banks argues that Dr. Ahmed was deliberately indifferent to his medical needs when he forcibly medicated Banks with Seroquel, violating his right to refuse medication and causing him to become addicted to the drug. It is unclear whether Banks challenges Dr. Ahmed's decision to forcibly medicate him, period, or whether he challenges Dr. Ahmed's choice to medicate him with 200 mg of Seroquel instead of

some other dosage or drug.  Either way, however, Banks's claim against Dr. Ahmed

fails.

A person, even when detained against his will, retains "a significant liberty

interest in avoiding the unwanted administration of antipsychotic drugs under the Due

Process Clause of the Fourteenth Amendment."  *Washington v. Harper*, 494 U.S. 210,

221 (1990).  The Court in *Washington* noted, however, that this right must be balanced

against the State's interest in maintaining safe facilities and its obligation to "take

reasonable measures for the [detainees'] own safety."  *Id.* at 225.  In a subsequent

case, the Court clarified that "due process allows a mentally ill inmate to be treated

involuntarily with antipsychotic drugs where there is a determination that the inmate is

dangerous to himself or others and the treatment is in the inmate's medical interest."

*Riggins v. Nevada*, 504 U.S. 127, 134–35 (1992) (internal quotations omitted);

*Washington*, 494 U.S. at 231 (medical professional may make decision to forcibly

medicate without judicial decree).

Dr. Ahmed testified that when he first met with Banks, he observed that Banks

displayed classic symptoms of "somebody with a severe mood disorder."  Mills Ex. C at

19.  Dr. Ahmed also testified that he decided to involuntarily medicate Banks "to prevent

further attacks, further deterioration, further attacks to the peer, [and] further attacks to

the staff," and Banks has produced no evidence to contradict this testimony.  *Id.* at 23.

Banks argues that because Dr. Ahmed erroneously thought that Illinois law compelled

him to force medication under these circumstances, he ran afoul of Banks's Fourteenth

Amendment right to refuse medication.  Banks is correct that Illinois law permits, but

does not require, a medical professional to administer involuntary treatment under these

circumstances. 405 ILCS 5/2-107. Dr. Ahmed's apparent ignorance of this aspect of state law, however, does not bear on the issue of whether he appropriately determined that Banks was a danger to himself or others and the treatment was in his medical interest, as necessary to meet federal constitutional requirements. *Cf. Virginia v. Moore*, 553 U.S. 164, 171 (2008) (states' added protections do not affect scope of individual's constitutional protections).

Banks's medical records reported that Elgin MHC transferred him to Chester MHC because of "aggression and threatening behavior towards staff and peers at Elgin MHC" and stated that Banks had been involved in a violent incident at the hospital. Ahmed Ex. F at 1. While at Chester MHC, Banks was involved in two physical altercations, including one with another detainee and one with staff members. Dr. Ahmed testified that he met with Banks after the first altercation and encouraged him to take a mood stabilizer, but Banks refused. At the time that Dr. Ahmed determined to forcibly medicate Banks, a number of mental health professionals had found that Banks was mentally ill. The Court concludes that, given the circumstances presented to Dr. Ahmed, he did not violate Banks's due process rights when he decided to forcibly medicate Banks after learning of his violent episodes, and no reasonable jury could conclude otherwise.

To the extent that Banks's claim attacks Dr. Ahmed's choice regarding the drug or dosage that he used, he cannot establish that Dr. Ahmed acted with deliberate indifference. Banks has not suggested any alternative medication that Dr. Ahmed should have chosen once he permissibly decided to forcibly medicate Banks. To the contrary, Dr. Ahmed testified, without contradiction, that Seroquel carried a much lower

risk of the most serious side effects—including neuroleptic malignant syndrome and tardive dyskinesia—than those associated with older antipsychotics like Haloperidol and Mellaril. And Banks has offered no evidence regarding an alternative dosage that would have been more appropriate to begin a course of Seroquel treatment, let alone that the dosage that Dr. Ahmed used was medically inappropriate.

Because Banks has offered no evidence of any alternative treatment plan that Dr. Ahmed should have pursued, let alone that the chosen course amounted to deliberate indifference, his claim against Dr. Ahmed cannot succeed. Based on the record before the Court, no reasonable jury could conclude that Dr. Ahmed's decision was "such a substantial departure from the accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008).

As a final matter, Banks's argument that it is his allegations, not his evidence, that should determine whether summary judgment is appropriate lacks merit. Although the court at the summary judgment stage will view the record in the light most favorable to the non-moving party, the party must still "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Banks's citations to his complaint, which contains merely allegations, are insufficient to establish a genuine issue of fact, and as discussed above, Banks has not produced evidence to establish a question of fact regarding Dr. Ahmed's liability.

For these reasons, the Court grants Dr. Ahmed's motion for summary judgment and denies Banks's corresponding motion for summary judgment.

## II.    Dr. Mills

Dr. Mills argues that he is entitled to summary judgment because Banks has failed to show that he was deliberately indifferent to Banks's medical needs, and alternatively that he is entitled to qualified immunity. Banks has also moved for summary judgment, arguing that there is no genuine issue of fact regarding Dr. Mills's deliberate indifference in treating him. When cross-motions for summary judgment are filed, a court applies the same standard to each motion. *See Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 906 (N.D. Ill. 2001); *Stimsonite Corp. v. Nightline Markers, Inc.*, 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999). Because, however, the two sides' motions include overlapping issues, the Court will address both motions together.

As an initial matter, Dr. Mills contends that he is entitled to summary judgment regarding Banks's "official capacity" claim against him. Dr. Mills argues that this claim, added for the first time in his second amended complaint, is barred by the Illinois statute of limitations and does not relate back to the date that Banks first filed suit. Banks has not responded to Dr. Mills's argument, nor has he produced evidence from which a reasonable jury could find that the alleged constitutional violations were caused by the policies or customs of either Cook County or CCJ. For this reason, Dr. Mills is entitled to summary judgment on Banks's official capacity claim.

The Court turns next to Banks's individual capacity claim against Dr. Mills. Because Banks was a pretrial detainee at all times relevant to this lawsuit, his section 1983 claim against Dr. Mills is arises under the Due Process Clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Sain*, 512 F.3d at 893. The protections for pretrial detainees under the Fourteenth Amendment are at least as

great as those available to convicted prisoners under the Eighth Amendment,

*Washington v. LaPorte Cnty. Sheriff's Dep't*, 306 F.3d 515, 517 (7th Cir. 2002), and they

include, among other things, the right to be provided with "adequate food, clothing,

shelter, and medical care." *Sain*, 512 F.3d at 893 (citing *Farmer v. Brennan*, 511 U.S.

825, 832 (1994)).

### A.    Deliberate indifference

To establish a due process violation, Banks must make a two-part showing.

First, he must demonstrate that "the deprivation he suffered was sufficiently serious;

that is, it must result in the denial of the minimal civilized measure of life's necessities."

*Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (internal quotation marks omitted).  "In

the medical care context, this objective element is satisfied when an inmate

demonstrates that his medical need itself was sufficiently serious." *Id.*  Second, Banks

must show through direct or circumstantial evidence that although aware of his medical

need, Dr. Mills acted with deliberate indifference in treating it.  *King v. Kramer*, 680 F.3d

1013, 1018 (7th Cir. 2012).  Negligence or inadvertence will not support a deliberate

indifference claim, but a plaintiff need not establish that the medical professional

actually intended the harm.  *Roe*, 631 F.3d at 857.  A plaintiff may demonstrate

deliberate indifference by showing that the medical professional's treatment "represents

such a substantial departure from accepted professional judgment, practice, or

standards, as to demonstrate that the person responsible actually did not base the

decision on such a judgment."  *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)

(internal quotation marks omitted).

Dr. Mills does not dispute that Banks's apparent mental illness—for which he had been forcibly medicated immediately prior to his arrival at CCJ, and which Dr. Mills himself diagnosed as schizophrenia—was an objectively serious medical condition. Thus the sole issue is whether a reasonable jury could find that Dr. Mills's actions or inaction amounted to deliberate indifference to Banks's medical needs. Construing the record in the light most favorable to Banks and leaving aside any assessment of his credibility, the Court concludes that there is sufficient evidence from which a reasonable jury could find Dr. Mills liable.

Banks testified at his deposition that he was not consistently receiving his medication from October 17, 2008 (when he arrived at CCJ) until mid-August 2009. Banks further stated that he personally notified Dr. Mills that he was not receiving the prescription. Dr. Mills was responsible for Banks's psychiatric care, and he knew that Banks was mentally ill. A reasonable jury could find that when Banks informed Dr. Mills that he was not receiving his medication, Dr. Mills's failure to conduct any further inquiry into the matter and take appropriate steps was "so inadequate that it demonstrated an absence of professional judgment . . . ." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998).

Dr. Mills contends that because he was not responsible for distributing the medication, he was not personally involved in any deprivation of Banks's constitutional rights. In support of his argument, Dr. Mills cites *Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002). The plaintiff in *Walker* had sued his doctor because of a delay in treatment that occurred after the doctor referred him to a specialist. *Id.* The court noted that the plaintiff had not established that the doctor had any control over the delay, and

that, even if he had, the delay itself did not contribute to the plaintiff's injuries. *Id.* Unlike in *Walker*, Banks has produced evidence from which a reasonable jury could find that his failure to receive medication caused his injuries, specifically, physical and psychiatric symptoms as a result of being denied Seroquel. He has also testified that he informed Dr. Mills of this directly. In addition, Dr. Mills has conceded that he had the ability to investigate and address the matter, even if he was not primarily responsible for Banks not getting his medication. In his reply brief, Dr. Mills argues that Banks should have approached the nurses to complain about not receiving any medication because they "had discretion whether to notify Dr. Mills of concerns with [Banks]." Mills Reply at 7. The issue before the court is not which CCJ staff members deserve more blame, but whether Banks has produced evidence that would permit a reasonable jury to find that Dr. Mills's own knowledge, followed by his own inaction, followed later by his affirmative decision to stop Banks's medication altogether, amounted to deliberate indifference to his medical needs. The Court concludes that Banks has satisfied this requirement.

Dr. Mills also argues that if Banks had notified him of the problem—which Dr. Mills disputes—he would have investigated the matter. This ignores the fact that Banks has testified that he *did* notify Dr. Mills, testimony that the Court is required to take as true at this stage of the case. Dr. Mills has pointed to no evidence suggesting that he made follow-up inquiries in response to Banks's complaints or that he did so in other similar situations. Moreover, a reasonable jury could also conclude that any minimally competent professional would have investigated the matter further by virtue of the number of blank entries or "N/Ps" in Banks's MARs. Finally, a jury reasonably could find that Dr. Mills's decision to discontinue Banks's Seroquel prescription in January

2009, thereby denying him *any* treatment for the mental illness that Dr. Mills himself had diagnosed, was such a substantial departure from accepted professional standards that he did not actually base his decision to discontinue medication on medical judgment at all. *See Sain*, 512 F.3d at 895. In sum, Dr. Mills is not entitled to summary judgment.

Turning to Banks's summary judgment motion, the fact that a reasonable jury could find Dr. Mills was deliberately indifferent to Banks's serious medical needs does not mean that it would have to find Dr. Mills liable. Construing the record in the light most favorable to Dr. Mills, a reasonable jury could conclude that he did not exhibit deliberate indifference in treating Banks. Dr. Mills testified that Banks never informed him that he was not receiving Seroquel. To the contrary, Dr. Mills testified, Banks repeatedly told staff at CCJ and Cermak Health Services that he was refusing the medication and did not need any antipsychotics. Dr. Mills testified that because Banks had effectively been off of Seroquel for approximately two months without incident, he felt that it was appropriate to discontinue Banks's medication altogether. Whether this amounted to a substantial departure from accepted professional standards or judgment is a question of fact that is appropriately reserved for the jury. Banks is not entitled to summary judgment.

### B.    Qualified immunity

Finally, Dr. Mills argues that he is entitled to qualified immunity because there is "no case law to support [the] position that a physician, who has had no hand in administering medication, has an obligation above reasonably investigating the complaint." Mills Reply at 25. Determination of whether an official is entitled to qualified

immunity is a legal question for the Court. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (internal quotation marks omitted) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Qualified immunity does not, however, require that a previous case be "fundamentally similar" to the present one, so long as the law provide the defendant "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In determining whether a defendant is entitled to qualified immunity, a court takes the facts in the light most favorable to the plaintiff and decides whether, given those facts, the defendant violated the plaintiff's clearly established constitutional rights. *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005).

The Court neither credits nor discredits Banks' version of the events but rather takes his version as true, as required at the present stage of the case. Banks has testified that he was not receiving the Seroquel that Dr. Mills prescribed for him and that he repeatedly notified Dr. Mills of this. Review of Banks's medical records would have revealed to Dr. Mills that there were multiple periods for which Banks's MARs reflected that he was "not present" or contained no mark at all indicating that he had been offered

23

the prescribed medication.  But rather than taking reasonable steps to make sure

Banks, whom Dr. Mills had diagnosed as schizophrenic, was getting his prescribed

psychotropic medications, Dr. Mills instead decided to stop prescribing it to him

altogether.  In addition, Dr. Mills took no other actions to treat Banks, despite having

diagnosed him with schizophrenia just three months earlier.

The Seventh Circuit has recognized as clearly established "the general standard

of liability under the Eighth Amendment for refusal to render medical treatment."

*Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).  The court has also

recognized a prisoner's right to access to prescribed medication.  *See Wynn v.

Southward*, 251 F.3d 588, 594 (7th Cir. 2001); *Ralston*, 167 F.3d at 1162; *Donald v.

Cook Cnty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996).  The Seventh Circuit has

recognized that even if an official takes some action regarding an alleged denial of

medication, he is liable if he takes "woefully inadequate action."  *Reed v. McBride*, 178

F.3d 849, 854 (7th Cir. 1999).

Construing the record in Banks's favor as required, Dr. Mills's actions and

inaction amount to a complete failure to provide Banks with treatment for the serious

psychiatric disorder that Dr. Mills had diagnosed, or at the very least constitute woefully

inadequate action.  Despite Banks's right to receive his prescribed medication—

medication that Dr. Mills himself had determined Banks needed—Dr. Mills is claimed to

have sat idly by for three months and then to have made matters worse by discontinuing

the prescription, preventing Banks from getting the treatment completely.  Such actions

would violate a detainee's clearly established rights.  Additionally, to the extent that the

cases the Court has cited do not clearly establish the precise contours of Banks's right

in the particular context at issue, Banks's evidence (if believed) would render Dr. Mills's constitutional violation so patently obvious "that no reasonable person could have believed that it would not violate clearly established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001).

The Court therefore determines that if the jury is persuaded by Banks's evidence, Dr. Mills could not reasonably have believed that his conduct complied with existing law. *See Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Dr. Mills's motion for summary judgment on the basis that he is entitled to qualified immunity is denied.

### Conclusion

For the reasons stated above, the Court grants Dr. Ahmed's motion for summary judgment [docket no. 145], denies Banks's motion for summary judgment [docket no. 161], and grants Dr. Mills's motion for summary judgment with regard to Banks's official capacity claim but otherwise denies the motion [docket no. 152]. The case is set for a status hearing on April 15, 2013 at 9:30 a.m. to set a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  April 9, 2013